Filed 2/27/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of T.B. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>     Petitioner and Respondent,<br>v.<br>T.B.,<br><br>     Objector and Appellant. | A167919<br><br>(Contra Costa County<br>Super. Ct. No. P2201606) |

Following a court trial, T.B. was found to be gravely disabled and appointed a conservator under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.; LPS Act or Act).[1]  T.B. appeals, arguing the trial court violated section 5350, subdivision (d)(2) (section 5350(d)(2)) and denied her due process when it failed to commence her trial within 10 days of her demand for one and denied her motions to dismiss the proceedings on the basis of the delay.

The issue presented involves the proper interpretation of section 5350(d)(2), which, effective January 1, 2023, the Legislature amended to add that the "[f]ailure to commence the trial within [10 days of a demand

---

[1] Undesignated statutory references that follow are to the Welfare and Institutions Code.

for trial] is grounds for dismissal." (Assembly Bill No. 2275 (2021–2022 Reg. Sess.) (Assembly Bill 2275); Stats. 2022, ch. 960, § 5.) We hold that the time limit for commencing trials set forth in amended section 5350(d)(2) is directory, not mandatory, and that dismissal for the failure to comply with the time limit is discretionary.

Applying this construction to the facts before us, we conclude that the trial court abused its discretion in denying T.B.'s motions to dismiss the proceedings, but that reversal is not required because T.B. has not demonstrated prejudice. We further conclude that T.B. has not shown her due process rights were violated by the delay. We therefore affirm.

## BACKGROUND

### The Petition and Pre-Trial Proceedings

On August 4, 2022, after T.B. was charged in a criminal case with two counts of misdemeanor battery upon a peace officer (Pen. Code, § 243, subd. (b)) and found incompetent to stand trial (*id.*, § 1368), her case was referred to the Public Guardian's Office of Contra Costa County (Public Guardian) to investigate a possible conservatorship for her. (*Id.* § 1370.01, subd. (b)(1)(D)(iii).)

Deputy Conservator Melinda Shrock, MFT, prepared a report on her investigation. In the report, Shrock noted that she had evaluated T.B. at the detention facility and reviewed T.B.'s medical and psychiatric history, as well police reports from the criminal proceedings. Shrock reported that T.B., then 46 years old, had been diagnosed with schizoaffective disorder and methamphetamine use disorder. She had been homeless since at least 2011. Shrock determined that T.B. was gravely disabled in that she was unable to provide for her food, clothing, and shelter due to having a major mental illness. Shrock thus recommended that T.B. be placed in locked mental

2

health facility where she could obtain structured treatment and safety and be appointed a conservator of her person. Shrock also recommended that certain disabilities be imposed on T.B., including on the privilege of possessing a motor vehicle license, as well as the rights to refuse treatment relating to grave disability, enter into contracts, and possess a firearm or other deadly weapon.

On October 10, the Public Guardian filed a petition for appointment of a conservator, for appointment of a temporary conservator pending resolution of that petition, and for imposition of certain disabilities as recommended in Deputy Conservator Shrock's investigation report. On the same day the petition was filed, the trial court appointed T.B. both a temporary conservator and counsel.

At a hearing held on November 4, T.B.'s attorney, Deputy Public Defender Alyssa Huff, requested a "jury trial time not waived." The court granted the request. It set trial for 10 days later, on November 14, consistent with section 5350(d)(2), which provided that "trial shall commence within 10 days of the date of the demand."

When the parties appeared at the scheduled trial on November 14, the Public Guardian's attorney, Monica Mueller of the County Counsel's Office, requested a continuance because she was "still awaiting records." The court also noted that it was going forward with other trials that week and that no other departments would be available to cover the calendar on conservatorship cases. The court found good cause to continue trial and scheduled it for December 5. T.B.'s attorney did not object to the continuance.

On December 5, the court informed the parties that it was expecting to proceed on another conservatorship trial that week; that there were two

3

potential trials scheduled for that week as well; and that no other departments would be available to cover the conservatorship case calendar. Also, according to the minute order, counsel (of which party was not specified) was going on vacation from December 19 to 26. The court found "good cause to continue this matter due to Court and Counsel unavailability." Trial was continued to January 9, 2023. T.B.'s attorney did not object to the continuance.

Meanwhile, on January 1, 2023, Assembly Bill 2275 took effect. Among other changes, it amended section 5350(d)(2) to include that the "[f]ailure to commence the trial within [the statutory time period] is grounds for dismissal of the conservatorship proceedings." (Stats. 2022, ch. 960, § 5.)

On January 9, the parties appeared in court, and, for a third time, attorney Mueller asked for continuance, because she was still awaiting records from one of T.B.'s prior psychiatric providers and was scheduled for another trial that week. The court noted it, too, would be engaged in another trial that week. T.B.'s attorney did not object to the continuance request. Finding good cause to continue trial based on "[c]ourt and [c]ounsel unavailability," the court scheduled trial on February 27 in Department 14.[2]

On February 27, Mueller reported she had received the records from T.B.'s providers. However, she requested another continuance, stating: "As Your Honor's already aware, Petitioner has prepared two court trials and two jury trials for this week, prioritizing based on dates set, as well as other issues such as the need for interpreters in certain trials, and in light of being prepared for four trials, Petitioner is not prepared on all 12 that are set for today, and so Petitioner would be moving to continue on this matter based on

---

[2] The court noted that after January 17, "all LPS cases . . . will be assigned to Department 14."

essentially Petitioner preparing for four others."[3]

This time, T.B.'s attorney, apparently anticipating another continuance request, filed earlier that day T.B.'s "Objection to Continuance and Motions for Release and Dismissal" pursuant to amended section 5350(d)(2) and the due process clause of the Fourteenth Amendment. She argued that "trial continuances beyond statutory deadlines must occur only for good cause" and that "the trial court's choice to limit the LPS trial schedule to one [d]epartment only two and a half days per week is not good cause . . . ."

The court found good cause to continue trial, thus overruling T.B.'s objections and denying her motion to dismiss, and scheduled trial for March 27.

On March 27, another attorney from the County Counsel's office, Nina Dong, appeared on behalf of the Public Guardian and stated she was ready to proceed with trial. The court, however, informed the parties that it was currently occupied in another trial, and that Department 14 was the only department available for conservatorship trials. Again, T.B. had filed earlier that day written objections to any further continuance and another motion to dismiss the proceedings. The court found good cause to continue trial and set

---

[3] We granted the Public Guardian's request to take judicial notice of three-minute orders for hearings in other conservatorship cases on February 27 in Department 14. In one case, Mueller and Huff were both counsel of record for the parties, and the trial court found good cause to continue trial "due to Court and Counsel unavailability." In the second case, Mueller and Huff were also counsel of record, and the court and parties proceeded in an ongoing trial with witness examination and closing arguments. The third case, in which Mueller was counsel of record, proceeded with its first day of trial.

5

it for May 1.[4]

On April 17, although the matter was not formally on calendar, the parties appeared before the court. Without opposition, attorney Mueller requested that the court advance the scheduled May 1 trial date to April 24. The court granted the request.

**The Trial**

A court trial commenced on April 24—171 days after T.B.'s initial demand for trial—and concluded the following day. T.B. refused transport to the court from the facility where she was placed and also refused to appear via Zoom. T.B., through her counsel, waived her right to be present and to a jury trial.

The Public Guardian called three witnesses: Deputy Conservator Melissa Shrock, T.B.'s father, Andre B., and psychiatrist Dr. Shahbaz Khan.

Shrock qualified as an expert on grave disability. She testified that T.B. was placed at Villa Fairmont Rehabilitation Center, an institution for mental disease. When Shrock had previously interviewed T.B., T.B. stated she had lived with her grandmother until her grandmother passed away 10 years ago. T.B. believed her grandmother was still in the home, even though she had passed, the home had been sold, and other people were living there.

T.B. admitted to Shrock that she had a history of drug and alcohol use. During Shrock's evaluation, T.B. was observed to be having visual hallucinations. She would swat the counter as if to swat bugs, which were not actually there. She also appeared startled at times, turning around to look as if someone was behind her. In addition, T.B. told Shrock that her

---

[4] Although the minute order states that County Counsel requested the continuance, the reporter's transcript only contains counsel's statement that the Public Guardian was ready to proceed with trial.

father was "Jason" from the movie, "Friday the 13th." T.B. also said that she had never met her father, but Shrock had spoken to her father, who reported that T.B. had lived with him previously. T.B. also had paranoid delusions that someone had electrocuted her during the night and that people could hear her thoughts. T.B. denied having a mental illness diagnosis or needing psychiatric medication.

T.B. told Shrock that she "likes to stay outside." She would obtain food and clothing by asking people for money and, whenever she was at Target, by putting food and clothing in a shopping cart and walking out the door.

To Shrock's knowledge, there was no third party offering any assistance to T.B. T.B. told Shrock that she could live with one of her sisters, but when Shrock tried to call the phone number given to her, there was no response. Likewise, Shrock could not find contact information for T.B.'s other sister, with whom T.B. also claimed she could live.

Andre B., T.B.'s father, testified that he saw T.B. regularly one to three times per week, and spoke with her on the phone two to three times per week. T.B. used to live at her grandmother's house until her grandmother passed away about seven to eight years ago and the house was sold. After her grandmother's passing, T.B. stayed with her two godmothers "off and on" for a couple of years, before starting to live on the streets. She tried to live with her son and also with her father, but mostly lived on the streets. When Andre saw T.B. on the street, she looked homeless and hungry, and she was not taking her medications. Andre also had seen T.B. walking on the street naked and had to tell her to wear clothes in public "many . . . times."

Andre testified that T.B. talked to herself and to people that were not there. She was also hostile. Andre brought T.B. to the hospital six to seven times and had her admitted to mental institutions and hospitals numerous

7

times. Andre testified T.B. never wanted to talk about her mental illness. T.B. refused to take her prescribed medications around the time she first became ill about 15 years ago. She told her father she did not need medication. In the past, Andre saw T.B. throw her medication into the toilet or away in the garage at either his or T.B.'s grandmother's house.

Andre was scared when T.B. used to live with him between the time she was 30 and 40 years old. She would constantly set the stove on fire, would never try to put out the fires, and would walk away, sometimes while saying, "Burn, burn, burn." T.B. generally did not stay in one place and did not abide by rules. T.B. admitted to using methamphetamine, pills, and cocaine whenever she was able to buy them herself or someone gave them to her.

Andre testified he was unable to provide for T.B.'s food, clothing, and shelter needs.

Dr. Khan qualified as an expert in psychiatry and grave disability. Before trial, Dr. Khan went to Villa Fairmont and met with T.B. He introduced himself to her and explained he was there to evaluate her for grave disability. T.B. "seemed very hostile and belligerent and didn't want to speak with [him] for too long." Dr. Khan gave T.B. some time and space to gather herself, but she grew more hostile and guarded.

Dr. Khan reviewed records from the various psychiatric facilities where T.B. had been placed, as well as reports from the Deputy Conservator. He also spoke to a nurse at Villa Fairmont. Based on his interactions with T.B., review of the records and reports, and conversations with the nurse, Dr. Khan diagnosed T.B. with chronic paranoid schizophrenia, "a severe mental condition in which a person, starting at an early age, develops alteration in their perception of reality, characterized by hallucinations" and "delusions."

8

Schizophrenia disorders affect "executive functioning," which is the ability to "make rational decisions for one's own safety and benefit." Schizophrenia also can include poor judgment and a lack of insight, which is the ability for the person to recognize he or she is suffering from a particular disorder. Dr. Khan explained that if someone lacks poor judgment or insight into their psychiatric illness, he or she will not be able to "participate or cooperate in taking care of it." Dr. Khan further testified that methamphetamine use can exacerbate the symptoms of chronic paranoid schizophrenia. The primary and most effective treatment for chronic paranoid schizophrenia is psychotropic medication.

Dr. Khan was asked whether a person meets the statutory criteria for grave disability based on the following hypothetical facts: if the person were diagnosed with a major mental illness, and experienced hallucinations, delusions, and disorganized behavior, "such as being frequently naked on the street . . . , walking away from stoves when items are cooking on it," or "plan[ning] on continuing to use methamphetamine, but does not believe psychiatric medication helps them and does not want it or to take it." Dr. Khan answered in the affirmative. He testified that the person would be gravely disabled because that person would have the symptoms of a severe mental illness and, as a result, would not be able to take care of his or her basic needs, such as food, clothing, shelter. Also, that person would be putting himself or herself at risk, and would not have "the insight to do things in a safe manner."

At the conclusion of trial, the court found beyond a reasonable doubt that T.B. was gravely disabled in that she was unable to provide for her own basic needs due to a severe mental disorder. It also found by clear and convincing evidence that the special disabilities requested by the Public

9

Guardian should be imposed. The court issued a letter of conservatorship, and an order appointing a conservatorship of the person of T.B. for a one-year period starting April 25, 2023.

## DISCUSSION

### The LPS Act

In order to address the claims raised in this appeal, a brief overview of the LPS Act is required. "The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of a mental disorder, are dangerous or gravely disabled. (§ 5150 et seq.)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 (*John L.*).) "The LPS Act promotes a variety of private and public interests." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 540 (*Ben C.*).)

"[T]here is no question that the public interests promoted by the LPS Act are substantial." (*John L.*, *supra*, 48 Cal.4th at p. 150.) "Among its goals are 'ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program. (§ 5001.)' ([*Conservatorship of*] *Susan T.* [(1994)] 8 Cal.4th [1005,] 1009.) The Act also serves to protect the mentally ill from criminal victimization (§ 5001, subd. (g)) and from the myriad forms of suffering endured by those unable to care for themselves." (*Ben C.*, *supra*, 40 Cal.4th at p. 540.)

Likewise, "[t]here can be no doubt '[t]he liberty interests at stake in [an LPS] conservatorship proceeding are significant. A person found to be gravely disabled may be involuntarily confined for up to one year, and the

10

conservatorship may be extended for additional one-year periods, so long as the person remains gravely disabled.' (*Ben C.*, *supra*, 40 Cal.4th at p. 540.) In addition to such confinement, a conservatorship may result in the loss of other personal rights, including driving privileges, contracting and voting rights, and the right to refuse or consent to medical treatment. (See *ibid.*; § 5357.) A person also has a reputational interest in not being improperly or unfairly stigmatized. (See *Conservatorship of Roulet* [(1979)] 23 Cal.3d [219,] 228–230.)" (*John L.*, *supra*, 48 Cal.4th at p. 150.)

"[B]ecause the private interests implicated in an LPS conservatorship are significant, 'several layers of important safeguards' have been built into the system (*Ben C.*, *supra*, 40 Cal.4th at p. 540) to 'vigilantly guard[ ] against erroneous conclusions' in such proceedings (*id.* at p. 542). For starters, the LPS Act provides for a 'carefully calibrated series of temporary detentions for evaluation and treatment' before a person may be found to be gravely disabled and subject to a year-long commitment. (*Ben C.*, at p. 541.) The process begins with an initial 72–hour detention for evaluation and treatment (§ 5150), which may be extended by certification for 14 days of intensive treatment (§ 5250) and is subject to additional extension periods of detention and involuntary commitment when further intensive treatment is found necessary (e.g., §§ 5270.15, 5300)." (*John L.*, *supra*, 48 Cal.4th at p. 151.)

"This series of temporary detentions may culminate in a proceeding to determine whether the person is so disabled that he or she should be involuntarily confined for up to one year." (*Ben C.*, *supra*, 40 Cal.4th at p. 541.) Specifically, the Act authorizes the appointment of a conservator for up to one year for a person determined to be gravely disabled. (§ 5350; *John L.*, *supra*, 48 Cal.4th at p. 142.) At the time of T.B.'s trial, "gravely

11

disabled" was defined to include "[a] condition in which a person as a result of a mental health disorder, . . . is unable to provide for [his or her] basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)[5] The proposed conservatee has a right to a jury trial on the question of grave disability at which the party urging conservatorship has the burden of proof beyond a reasonable doubt. (*John L.*, at p. 143.)

**Interpretation of Amended Section 5350(d)(2)**

When T.B. demanded a trial on November 4, 2022, section 5350(d)(2) stated: "Court or jury trial shall commence within 10 days of the date of the demand, except that the court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee." As explained in more detail below, Courts of Appeal have construed this time limit as directory, not mandatory. (See *Conservatorship of James M.* (1994) 30 Cal.App.4th 293, 298 (*James M.*); accord, *Conservatorship of Jose B.* (2020) 50 Cal.App.5th 963, 972–974 (*Jose B.*); *Conservatorship of M.M.* (2019) 39 Cal.App.5th 496, 500 (*M.M.*).)

Effective January 1, 2023, after T.B. demanded trial, but before trial commenced, the Legislature amended section 5350(d)(2) to add that the "[f]ailure to commence the trial within [the 10- or 15- day time period] is grounds for dismissal of the conservatorship proceedings." (Stats. 2022, ch. 960, § 5.)

---

[5] Effective January 1, 2024, the Legislature enacted Senate Bill No. 43 (2023–2024 Reg. Sess.), which expanded the definition of "gravely disabled" to include "a condition in which a person, as a result of a mental health disorder, a severe substance use disorder, or a co-occurring mental health disorder and a severe substance use disorder, is unable to provide for the basic personal needs for food, clothing, or shelter, their personal safety, or necessary medical care." (Stats. 2023, ch. 637, § 2; § 5008, subd. (h)(1)(A).)

The question presented is whether the Legislature, when it amended section 5350(d)(2), intended to depart from the interpretation of the statute given in *James M.* and subsequent cases.

T.B. argues that the Legislature intended to depart from the existing statutory interpretation and adopt a new one that gives the time limit in amended section 5350(d)(2) mandatory effect. Consequently, T.B. concludes that the trial court was required to dismiss the proceedings after the amendment took effect because it failed to commence trial within the statutory period. Under the Public Guardian's interpretation, amended section 5350(d)(2) is still directory and preserves the discretion of the courts to determine whether to dismiss a petition when trial is not commenced within the statutory period. Accordingly, the Public Guardian asserts that the trial court in this case had discretion to decide whether dismissal was appropriate. As now explained, we agree with the Public Guardian.

### *General Legal Principles*

The issue here involves the interpretation of a statute, a question of law that we review de novo. (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 658.)

"In interpreting statutory requirements, court have . . . used the terms 'mandatory' and 'directory.' " (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 340 (*Kabran*).) "The word 'mandatory' may be used in a statute to refer to a duty that a governmental entity is required to perform as opposed to a power that it may, but need not exercise." (*California Correctional Peace Officers Association v. State Personnel Board* (1995) 10 Cal.4th 1133, 1145 (*California Correctional*).)

"Whether a requirement is mandatory or directory is determined largely by its effect: 'If the failure to comply with a particular procedural step

13

does not invalidate the action ultimately taken, . . . the procedural requirement is referred to as "directory." If, on the other hand, it is concluded that noncompliance does invalidate subsequent action, the requirement is deemed "mandatory." [Citation.]' [Citations.] The mandatory-directory distinction is not to be confused with the distinction between 'obligatory' and 'permissive' statutory provisions. [Citation.] The latter distinction concerns whether a governmental entity or party is required to conform to a certain procedure (i.e., obligatory) or whether it 'may or may not comply as it chooses' (i.e., permissive). [Citations.] By contrast, ' "the 'directory-mandatory' distinction is concerned only with whether a *particular remedy*—invalidation of the ultimate governmental action—is appropriate when a procedural requirement is violated." ' [Citations.]" (*Kabran*, *supra*, 2 Cal.5th at p. 340.)

"Time limits are usually deemed to be directory unless the Legislature clearly expresses a contrary intent. [Citation.]" (*California Correctional*, *supra*, 10 Cal.4th at p. 1145.) "Courts have . . . adopted various tests to determine the Legislature's 'probable intent' regarding a statute's time requirements." (*People v. Allen* (2007) 42 Cal.4th 91, 102, fn. 6.)

"Some courts have held that the presumption may only be overcome where ' "a consequence or penalty is provided for failure to do the act within the time commanded." ' [Citations.] Other courts have looked to whether the consequences of holding a time limitation mandatory or jurisdictional 'would defeat or promote the purpose of the enactment.' [Citation.]" (*Kabran*, *supra*, 2 Cal.5th at p. 343.) " 'There is " 'no simple, mechanical test' " for making this determination.' [Citation.]" (*Ibid.*) As in any case involving statutory interpretation, "[t]he question is ultimately one of legislative intent. [Citation.]" (*Ibid.*)

14

The process "to ascertain [Legislative] intent may involve up to three steps." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 (*MacIsaac*).) First, we look to the words of the statute itself, as the "chosen language is the most reliable indicator of its intent." (*Ibid.*) "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (*Id.* at p. 1083.) When the plain meaning of the text does not resolve the question, we proceed to the second step and turn to maxims of construction and extrinsic aids, including legislative history materials. (*Ibid.*) If ambiguity remains, we "must cautiously take the third and final step" and "apply 'reason, practicality, and common sense to the language at hand.' [Citation.]" (*Id.* at p. 1084.) At this step, "we must consider the consequences that will flow from a particular interpretation. [Citation.]" (*Ibid.*)

Another pertinent principle of statutory interpretation is that "the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' [Citations.]" (*People v. Overstreet* (1986) 42 Cal.3d 891, 897; accord, *Leider v. Lewis* (2017) 2 Cal.5th 1121, 1135.) We thus view the amendment of section 5350(d) against the background of the statutory and decisional developments preceding it.

### *Former Section 5350(d)(2) and Cases Interpreting It*

As noted, when T.B. demanded a trial, section 5350(d) stated in full: "(1) The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether the person is gravely disabled. . . . [¶] (2) Court or jury trial shall commence within 10 days of the date of the demand, except that the court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed

15

conservatee. . . . [¶] (3) This right shall also apply in subsequent proceedings to reestablish conservatorship." (Former § 5350, subd. (d)(1)–(3).)

In *James M.*, *supra*, 30 Cal.App.4th 293, because of a snowstorm, the trial for the reappointment of a conservator was delayed until 14 days after the conservatee's demand for a trial. In rejecting the conservatee's claim that the delay divested the trial court of jurisdiction to hear the reappointment petition, *James M.* concluded that the statutory time limit was directory. (See *id.* at p. 298–299.) The court first explained, " ' "the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded 'mandatory' or 'directory' effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. . . ." (*Id.* at p. 298.) Applying these principles, the court determined: "Section 5350, subdivision (d) does not provide a consequence or penalty for failure to commence the trial within 10 days of the demand. [Citations.] This omission suggests the statute is intended to be directory only." (*Ibid.*)

The *James M.* court continued: "Moreover, one consequence of holding section 5350, subdivision (d) mandatory would be to divest the trial court of jurisdiction by *mere implication* rather than by express statutory command. [Citation.] 'While the courts are subject to reasonable statutory regulation of procedure and other matters, they will maintain their constitutional powers in order effectively to function as a separate department of government. [Citations.] Consequently an intent to defeat the exercise of the court's jurisdiction will not be supplied by implication.' [Citation.] For this reason,

16

we cannot say the Legislature *impliedly intended* to divest the superior court of jurisdiction to rule on a conservatorship petition where, as here, the trial is delayed four days by an act of nature beyond the control of the court or other local officials." (*James M.*, *supra*, 30 Cal.App.4th at pp. 298–299.)

The *James M.* court went on to acknowledge "that a conservatee has a strong interest in a prompt determination of issues raised by a reappointment petition so that he or she may avoid the disabilities of conservatorship where they no longer are warranted by the evidence. [Citations.]" (*James M.*, *supra*, 30 Cal.App.4th at p. 299.) The court, however, determined that "this interest is sufficiently protected by the undisputed power of the superior court to dismiss the reappointment petition where the delay in the proceedings has proved prejudicial to the conservatee's interests," adding, "[w]e do not believe the conservatee's interest is so overarching as to require the divestiture of superior court jurisdiction where, as here, the delay is attributable to the forces of nature and is in no way prejudicial." (*Ibid.*) As such, the court concluded that "section 5350, subdivision (d) should be accorded directory rather than mandatory effect" and the conservatee's "motion to dismiss the reappointment petition was properly denied." (*Ibid.*)

Subsequently, the courts in *M.M.*, *supra*, 39 Cal.App.5th 496 and *Jose B., supra,* 50 Cal.App.5th 963 adopted the reasoning in *James M.* in concluding that former section 5350(d)(2) was directory.

*Jose B.* provided an additional reason for such a construction: that giving the statute mandatory effect would pose constitutional separation of powers problems. (See *Jose B.*, *supra*, 50 Cal.App.5th at p. 973.) " '[W]hile the Legislature has broad authority to regulate procedure, the constitutional separation of powers does not permit statutory restrictions that would

17

materially impair fair adjudication or unduly restrict the courts' ability to administer justice in an orderly fashion.' (*Briggs* [*v. Brown* (2017)] 3 Cal.5th [808,] 854 [(*Briggs*)].) . . . 'Deciding cases and managing dockets are quintessentially core judicial functions. They are grounded in the Constitution and may not be materially impaired by statute.' (*Briggs*, at p. 858.)" (*Ibid*.) The court concluded that because strict enforcement of the statutory time limit would impede on these core judicial functions, section 5350(d)(2) should be given directory effect. (*Jose B.*, at p. 973.)

Applying that construction to its facts, *Jose B.* held that the trial court did not act in excess of its jurisdiction in commencing trial for the reappointment of a conservator 137 days after the conservatee's jury trial demand. (*Jose B.*, *supra*, 50 Cal.App.5th at p. 967.) Having so concluded, however, the court expressed it was "deeply troubled by the significant delay of over four months in holding a trial on [the] petition, especially given the lack of any justification by the court for most of the delay." (*Ibid*.) It stated that just because the Legislature had "not expressly provided" a penalty for the failure to follow the established time limits "does not mean trial courts should blithely continue conservatorship trials for their judicial convenience." (*Ibid*.) The court added that a proposed conservatee's proper remedy for prejudicial delay is to file a motion to dismiss for lack of a speedy trial. (*Ibid*.)

### *Under Amended Section 5350(d)(2), the Time Limit Is Directory and Dismissal Is Discretionary*

T.B. essentially argues that by amending section 5350(d)(2) to include dismissal as a consequence for the failure to comply with the time limit, the Legislature intended to depart from the interpretation of the statute given by existing case law. She contends, therefore, "the limits are now mandatory." We disagree.

18

As noted, we presume that the Legislature was aware of *James M.* and the cases following it when it amended section 5350(d)(2). (See *Leider v. Lewis*, *supra*, 2 Cal.5th at p. 1135; *People v. Overstreet*, *supra*, 42 Cal.3d at p. 897.) We are also mindful of the principle that a change in statutory language generally indicates an intent to change its meaning, especially where the courts have construed the old statute as having a particular meaning. (*Allied Premier Insurance v. United Financial Casualty Co.* (2023) 15 Cal.5th 20, 33; *O'Brien v. Dudenhoeffer* (1993) 16 Cal.App.4th 327, 335.) But "[a]lthough courts ordinarily infer an intent to change the law from a material change in the language of a statute [citations], the circumstances may indicate merely a legislative intent to clarify the law." (*W.R. Grace & Co. v. California Employment Commission* (1944) 24 Cal.2d 720, 729; accord, *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243.)

Based on the plain language of amended section 5350(d)(2), a review of its legislative history, and consideration of the consequences of the proposed interpretations, we conclude that the Legislature did not intend to reject the interpretation of the statute given by *James M.* and its progeny. Rather, the amendment signifies the Legislature's intent to clarify and bring the statute into conformity with the prior judicial interpretation.

We start with the plain language of amended section 5350(d)(2). It states: "Court or jury trial shall commence within 10 days of the date of the demand, except that the court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee. Failure to commence the trial within that period of time is grounds for dismissal of the conservatorship proceedings." (Stats. 2022, ch. 960, § 5.)

Although "the word 'shall' in a statute is ordinarily deemed mandatory" (*California Correctional*, *supra*, 10 Cal.4th at p. 1143), the word "shall" (or

19

"may") is not dispositive when deciding whether a timeline is mandatory in the sense that it deprives the government of authority to act. (*Olive Lane Industrial Park, LLC v. County of San Diego* (2014) 227 Cal.App.4th 1480, 1492, citing *People v. Allen, supra*, 42 Cal.4th at pp. 101–102.) "The context of the language, as well as other indicia of legislative intent, must be considered." (*People v. Lara* (2010) 48 Cal.4th 216, 227.) As noted, one factor bearing on legislative intent on the mandatory or directory effect of a time limit is whether the Legislature included a penalty or consequence for noncompliance with the time limit. (*Kabran, supra*, 2 Cal.5th at p. 343.)

It is true, as T.B. contends, that the reasoning of *James M.* was based, in part, on the absence of any consequence in former section 5350(d)(2) for noncompliance with the time limit. (See *James M., supra*, 30 Cal.App.4th at p. 298.) T.B. is also correct that amended section 5350(d)(2) now provides for a consequence or penalty—dismissal. While at first blush these circumstances seem to support T.B.'s interpretation of the statute, a closer review of the language chosen by the Legislature leads us to reach a different conclusion.

We focus on the phrase "grounds for" in the newly added sentence, "Failure to commence the trial within that period of time is grounds for dismissal of the conservatorship proceedings." (§ 5350, subd. (d)(2).) As ordinarily understood, "grounds for" something such as an action simply means "a basis for" that action. (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/grounds> (as of Jan. 12, 2024); Dictionary.com (2024) <https://www.dictionary.com/browse/grounds> [as of Jan. 12, 2024] [defining "grounds" as "the foundation or basis on which a belief or action rests; reason or cause: *Harassment is grounds for dismissal*"].) The use of the phrase "grounds for dismissal" indicates that the

20

Legislature did not intend for dismissal to be automatic or self-executing upon noncompliance. Instead, it contemplates that some predicate action on the part of the trial court must be taken to effect dismissal. Thus, as reasonably interpreted, the language reflects the Legislature's intent to identify what constitutes proper grounds for dismissal of a conservatorship petition "if the trial court were so inclined, not that dismissal was automatic." (*Richards, Watson & Gershon v. King* (1995) 39 Cal.App.4th 1176, 1179; cf. *id.* at pp. 1179–1181 [dismissal under Bus. & Prof. Code, § 6201, subd. (a), which states that an attorney's failure to provide notice of the right to arbitration when suing client to recover fees "shall be a ground for the dismissal of the action," was discretionary, not mandatory].)

Had the Legislature intended for dismissal to be required, it would have said so clearly and explicitly. (Cf. § 5362, subd. (b) [statute for reestablishing conservatorship provides: "If the conservator does not petition to reestablish conservatorship at or before the termination of the one-year period, the court shall issue a decree terminating conservatorship"]; § 5276 [provides that when a detainee pursues judicial review of a 14-day intensive treatment detention, "[t]he court shall either release the person or order an evidentiary hearing to be held within two judicial days after the petition is filed"]; Code Civ. Proc., § 660, subd. (c) [provides that if the trial court fails to rule on a motion for new trial before the expiration of the specified time within which the trial court may rule on the motion, "the effect shall be a denial of the motion without further order of the court"]; *id.*, § 630, subd. (f) [statute pertaining to a motion for directed verdict similarly states "the power of the court to act . . . shall expire 30 days after the day upon which the jury was discharged, and if judgment has not been ordered within that time the effect shall be the denial of any motion for judgment without further

21

order of the court"].)

As such, we agree with the Public Guardian that section 5350(d)(2) "leav[es] it to the discretion of the court to consider 'grounds for dismissal of the conservatorship proceedings.' " The fact that section 5350(d)(2) does not include a self-executing consequence for noncompliance with the time limit supports the conclusion that the time limit is directory, not mandatory. (See *Tran v. County of Los Angeles* (2022) 74 Cal.App.5th 154, 166 [" '[S]tatutes setting forth time frames for government action that do not include a self-executing consequence are almost universally construed as directory, rather than mandatory or jurisdictional.' [Citation]"].)

Interpreting amended section 5350(d)(2) as directory and preserving trial court discretion over dismissal of a petition is consistent with the result of *James M.* and cases following it. Not only did the cases conclude that the statutory time period in the former statute was directory, but they also recognized "the undisputed power of the superior court to dismiss the [appointment or] reappointment petition where the delay in the proceedings has proved prejudicial to the conservatee's interests." (*James M.*, *supra*, 30 Cal.App.4th at p. 299; accord, *Jose B.*, *supra*, 50 Cal.App.5th at pp. 971, 974; see also *Jose B.*, at p. 967 ["If a proposed conservatee contends he or she has been prejudiced by the delay, the proper remedy is to file a motion to dismiss for lack of a speedy trial"].) If the Legislature intended to depart from the case law, it would have used plain and unmistakable language to that effect, as discussed above. In short, the text of amended section 5350(d) supports the conclusion that the Legislature did not intend to reject the prior judicial construction of the statute as directory.

Assuming, however, that the plain language does not resolve the interpretation question, we will proceed to the second step of the inquiry and

look to extrinsic aids, specifically the statute's legislative history. (*MacIsaac*, *supra*, 134 Cal.App.4th at pp. 1083–1084.) The parties have not supplied us with any of the legislative history materials from Assembly Bill 2275. We have on our own motion, consulted the available legislative reports and analyses from Assembly Bill 2275. The legislative materials contain scant evidence on the Legislature's intent in amending section 5350(d)(2). As T.B. notes in her reply brief, the focus of the bill was primarily on the timelines and procedures surrounding the beginning stages of the involuntary commitment process under the LPS Act, namely the initial 72–hour detention for evaluation and treatment (§ 5150) and the 14-day extension of that detention period upon certification (§§ 5250, 5256). (Stats. 2022, ch. 960.)[6] Thus, the legislative history sheds little light on whether the Legislature intended the time limit in amended section 5350(d)(2) to be mandatory or directory.

We therefore proceed to the third step of the interpretation inquiry and consider "the consequences that will flow from a particular interpretation." (*MacIsaac*, *supra*, 134 Cal.App.4th at p. 1084.) Of particular relevance here is the canon of constitutional avoidance. Under that canon, "[w]hen a question of statutory interpretation implicates constitutional issues, we are guided by the precept that ' "[i]f a statute is susceptible of two constructions,

---

[6] The preamble of Assembly Bill 2275 states, in part: "This bill would, among other things, specify that the 72-hour period of detention begins at the time when the person is first detained. The bill would remove the provisions for postponement of the certification review hearing. The bill, when a person has not been certified for 14-day intensive treatment and remains detained on a 72-hour hold, would require a certification review hearing to be held within 7 days of the date the person was initially detained and would require the person in charge of the facility where the person is detained to notify the detained person of specified rights." (Stats. 2022, ch. 960.)

one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable." ' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373, quoting *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548.)

As discussed above, the *Jose B.* court applied this canon before concluding section 5350(d)(2) was directory. (*Jose B.*, *supra*, 50 Cal.App.5th at p. 973.) Relying on *Briggs*, *supra*, 3 Cal.5th 808, the *Jose B.* court explained: " '[W]hile the Legislature has broad authority to regulate procedure, the constitutional separation of powers does not permit statutory restrictions that would materially impair fair adjudication or unduly restrict the courts' ability to administer justice in an orderly fashion.' (*Briggs*, *supra*, 3 Cal.5th at p. 854.) The Supreme Court in *Briggs*, in holding the requirement in Proposition 66, the Death Penalty Reform and Savings Act of 2016 (as approved by voters, Gen. Elec. (Nov. 8, 2016) § 1), that the appellate review process for capital cases be completed within five years was directory rather than mandatory, declined to infer the voters 'intended strict adherence to a fixed deadline that would undermine the courts' authority as a separate branch of government.' (*Briggs*, at p. 858; accord, *People v. Engram* (2010) 50 Cal.4th 1131, 1151–1152 ['in light of the constitutional separation-of-powers considerations,' Pen. Code, § 1050, subd. (a), which gives trial preference to criminal cases over civil cases, 'cannot properly be interpreted to require a trial court completely to forgo or abandon consideration of *all* civil cases' or 'to strip a trial court of the ultimate control over the cases

24

within its jurisdiction'].) The *Briggs* court explained, 'Deciding cases and managing dockets are quintessentially core judicial functions. They are grounded in the Constitution and may not be materially impaired by statute.' (*Briggs*, at p. 858.)" (*Jose B.*, at p. 973.) Accordingly, our construction avoids constitutional problems of separation of powers.

This analysis applies equally to amended section 5350(d)(2). T.B.'s argument that the current statute deprived the court of any discretion to deny her motions to dismiss would pose separation of powers problems. In order to avoid impinging on the courts' inherent authority to control their dockets and decide cases, amended section 5350(d)(2) must be construed as directory and preserving the discretion of courts in deciding whether to dismiss a conservatorship petition upon a delay in commencing trial.

Additionally, we note that the result we reach in accord with " 'reason, practicality, and common sense.' " (*MacIsaac*, *supra*, 134 Cal.App.4th at p. 1084.) As discussed above, the LPS Act's comprehensive statutory scheme represents a delicate balancing of countervailing public and individual interests. (*Ben C.*, *supra*, 40 Cal.4th at p. 540.) "There can be no doubt that '[t]he liberty interests at stake in [an LPS] conservatorship proceeding are significant.' " (*John L.*, *supra*, 48 Cal.4th at p. 150.) Among other interests, a proposed conservatee has a right to the prompt determination of issues raised by a conservatorship petition. (*James M.*, *supra*, 30 Cal.App.4th at p. 299.) "Likewise, there is no question that the public interests promoted by the LPS Act are substantial." (*John L.*, at p. 150.) These interests include protecting public safety, providing individualized treatment, supervision, and placement services for the gravely disabled by means of a conservatorship program, and protecting the mentally ill from criminal victimization and from the myriad forms of suffering endured by those unable to care for themselves. (*Ibid.*)

25

In view of this broad spectrum of countervailing interests, we believe that the interpretation advanced by the Public Guardian is more reasonable and practical than the one advanced by T.B. Under the Public Guardian's interpretation, the court would retain the flexibility to accommodate circumstances beyond a party's control—such as, for example, if a proposed conservatee faced a mental health crisis and/or transportation issues and was unable to appear in court, if witnesses were not available to testify on the scheduled date, or subpoenaed records or other evidence were not immediately available—while also being able to dismiss a petition where the delay "has proved prejudicial to the [individual's] interests." (*James M.*, *supra*, 30 Cal.App.4th at p. 299.) Indeed, T.B. acknowledges that the unavailability of subpoenaed records and "the unexpected unavailability of a courtroom could constitute good cause" for continuing a trial.

On the other hand, the fixed deadline and mandatory dismissal urged by T.B. would render the courts powerless to conduct proceedings beyond the statutory time limit, regardless of the reasons for the delay or the degree of the delay. Moreover, in our view mandatory deadline and dismissal would singularly protect private interests, possibly at the expense of the public interests promoted by the LPS Act, including " 'the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community.' " (*Conservatorship of Susan T.*, *supra*, 8 Cal.4th at p. 1015.)

For all these reasons, we conclude that the time limit in amended section 5350(d)(2) is directory and that the remedy of dismissal for a failure to comply with the time limit is subject to the discretion of the trial court.

We now apply this interpretation to the facts before us.

**Application of Amended Section 5350(d)(2) to This Case**

T.B. argues that even if trial courts have "discretion to decide whether dismissal [is] an appropriate remedy" under section 5350(d)(2), the trial court in this case abused its discretion in denying her motions to dismiss.

Preliminarily, we note that T.B. presents her arguments under various headings in her opening brief. Under the subheading "Abuse of Discretion," she argues that the court abused its discretion by failing to exercise its discretion altogether. In her words: "the trial court suffered from the mistaken belief that the time limits under the statute were directory not mandatory. Along with the equally mistaken belief that the government's decision to devote inadequate resources to the LPS litigation process in court systems in Contra Costa County was perfectly acceptable. Therefore the trial court failed to exercise its discretion and reversal is required." However, under a different subheading entitled "Relevant Law," T.B. goes beyond explaining the relevant law and proceeds to argue why the trial court here did not follow it, concluding the "the trial court abused its discretion and made a legal error by failing to recognize the lack of good cause on February 27th and March 27th."[7]

Although T.B. frames the issue as a failure to exercise discretion, her arguments challenging the trial court's good cause findings are actually directed at findings that it made in the exercise of its discretion. We thus

---

[7] To the extent T.B.'s opening brief contains loose and disparate arguments that are not clearly set out in an appropriate heading, her opening brief fails to comply with California Rules of Court, rule 8.204(a)(1)(B) (further undesignated rule references are to the California Rules of Court). We may thus deem the contentions forfeited. (See *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1304–1305.) Even if the contentions were not forfeited, for the reasons stated in the text we would conclude that T.B. fails to demonstrates reversible error.

construe T.B.'s arguments as challenging the manner in which the trial court exercised its discretion.

As to how to conduct our review under the abuse of discretion standard, "this court explained at some length in *People v. Jacobs* (2007) 156 Cal.App.4th 728 [that] various definitions of the . . . standard have been announced in numerous cases, but the standard cannot be boiled down to simply calling for reversal only if a ruling appears to be arbitrary, capricious or utterly irrational. (See *id.* at pp. 736–738.)" (*People v. Williams* (2021) 63 Cal.App.5th 990, 1000.) Our Supreme Court in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*) confirmed this, explaining: "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited," especially when, as here, its exercise implicates a party's interest in the prompt determination of issues raised by a conservatorship petition. "Rather, it must be exercised within the confines of the applicable legal principles." (*Ibid.*) " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citations.] 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] . . . [¶] The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred.'

28

[Citation.]"  (*Ibid.*; accord, *People v. Jacobs*, *supra*, 156 Cal.App.4th at p. 737.)

This leads us to the parties' arguments related to whether in the exercise of its discretion to dismiss a conservatorship proceeding under section 5350(d)(2), a trial court may consider whether "good cause" exists to continue the trial.  T.B. asserts that because the statute does not refer to "good cause," a trial court may not consider it.  It does not appear that T.B. raised this argument in the trial court.  In fact, in her motions to dismiss, she asserted that "trial continuances beyond statutory deadlines must occur only for good cause."  As such, T.B. has forfeited her claim that the court could not consider the existence of good cause to continue trial.  (*In re Abram L.* (2013) 219 Cal.App.4th 452, 462 ["As a general rule, a party who does not raise an argument below forfeits the argument on appeal"].)

T.B.'s argument is also unavailing for the reasons asserted by the Public Guardian.  As the Public Guardian notes, the procedure for establishing, administering, and terminating LPS conservatorship is the same as for conservatorship under Division Four the Probate Code except as otherwise provided in the LPS Act.  (§ 5350.)  And the Public Guardian points out, Probate Code section 1827 states:  "The court shall hear and determine the matter of the establishment of the conservatorship according to the law and procedure relating to the trial of civil actions, including trial by jury if demanded by the proposed conservatee."  Rule 3.1332 of the California Rules of Court, which pertains to civil trials, sets forth the procedure for requesting a trial continuance, the requirement of showing "good cause" for a continuance, and specific circumstances that may indicate good cause.  (Rule 3.1332(b)–(d).)  In light of these authorities, we disagree with T.B. that the trial court could not consider whether good cause existed to continue trial beyond the statutory time period—and thus whether to dismiss a

29

conservatorship petition on that basis.

We next address T.B.'s claim that the court abused its discretion in denying her motions to dismiss. It is undisputed that T.B.'s trial did not commence within 10 days of her demand for one on November 4, 2022. The court found good cause to continue trial on five separate occasions, resulting in trial commencing on April 24, 2023, 171 days after her demand. As discussed, T.B.'s first trial date—November 14, 2022, which was within the statutory deadline—was continued because counsel for the Public Guardian, Monica Mueller, was "still awaiting records." The second trial date of December 5, 2022 was continued because, among other reasons, the court was expecting to proceed on other trials that week. As of the third continuance granted on January 9, 2023, Mueller was still awaiting records and had a calendar conflict, as she was scheduled for another trial that week. Likewise, the court was also unavailable because it was set to preside over other trials that week. T.B.'s attorney did not object to these three continuances.

T.B. focuses her argument on the fourth and fifth continuances on February 27 and March 27, 2023, when she finally objected to the continuances and moved to dismiss the proceedings pursuant to amended section 5350(d)(2). On February 27, the court found good cause to continue trial and deny the motion to dismiss in light of Mueller's explanation she was not prepared to try the case. She informed the court that she had prepared for four other trials in other cases and that she was "not prepared on all 12 that [were] set for [that day]." On March 27, the parties were ready to proceed with trial, but the court found good cause to continue it because it was currently occupied in another one and no other department was available to preside over conservatorship trials.

30

According to T.B., "the trial court abused its discretion . . . by failing to recognize the lack of good cause on February 27th and March 27th." T.B. relies in part on *Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389 (*Oliveros*). In *Oliveros*, the trial court denied the county's request for a trial continuance due to the unexpected engagement of its attorney in another trial. (*Id.* at p. 1393.) The case went to trial on schedule, without either the county or its attorney present. The county appealed. (*Id.* at pp. 1394–1395.)

The appellate court reversed, concluding the trial court abused its discretion in refusing to continue the case and forcing the county to proceed to trial without counsel. (*Oliveros*, *supra*, 120 Cal.App.4th pp. 1395–1399.) *Oliveros* based its holding partly on the grounds that the trial court did not consider all of the facts and circumstances relevant to ruling on the county's request for a continuance. (*Ibid.*) It began by noting that " '[j]udges are faced with opposing responsibilities when continuances . . . are sought. On the one hand, they are mandated by the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.) to actively assume and maintain control over the pace of litigation. On the other hand, they must abide by the guiding principle of deciding cases on their merits rather than on procedural deficiencies.' [Citation.]" (*Oliveros*, *supra*, 120 Cal.App.4th at p. 1395.) The court then stated, "Here, the record is devoid of the balancing of these competing interests." (*Ibid.*) "[T]he trial court did not consider all of the facts and circumstances relevant to a ruling on the County's request for a continuance, nor the specific factors enumerated in [former] revised rule 375(d) [(now rule 3.1332)] or section 9 of the Standards for Judicial Administration." (*Oliveros*, at p. 1399.) Rather, the court focused, improperly, on just one issue: judicial efficiency. "[T]he judge's reported comments suggest that the

31

only factor he took into consideration, and which became the decisive factor in his ruling, was the impact of a continuance on the court's calendar." (*Ibid.*) The *Oliveros* court explained, "While this is a valid factor to be weighed with the other facts and circumstances presented, it cannot be the be-all and end-all." (*Ibid.*) As a result, *Oliveros* held the trial "court's failure to carefully balance all of the competing interests at stake . . . constituted an abuse of discretion." (*Ibid.*)

T.B.'s arguments with respect to *Oliveros* are not entirely clear. On one hand, she appears to distinguish *Oliveros* from this case, asserting that unlike the unexpected calendar conflict of the attorney in that case, here, the unavailability of County Counsel was foreseeable and thus not good cause to continue the trial. On the other hand, T.B. at times seems to analogize this case to *Oliveros*, as she argues that the trial court here "did not exercise its discretion by considering [certain] factors." These include the heavy backload of cases of County Counsel; the routine unavailability of courtrooms; the "long delay" that had elapsed since her initial demand for trial; and the two prior continuances that the court had granted. T.B. also complains that "the trial court made no attempt to determine whether there were other attorneys in the County Counsel's Office who could have handled the case . . . ."

To the extent T.B. asserts that the trial court here abused its discretion because it did not consider and weigh all relevant facts and circumstances before denying her motions to dismiss, we see some merit in this assertion. Rule 3.1332(d) states that in considering a request for continuance, "the court must consider all the facts and circumstances that are relevant to the determination. These may include: [¶] . . . [¶] (2) [w]hether there was any previous continuance, extension of time, or delay of trial due to any party; [¶] (3) [t]he length of the continuance requested; [¶] (4) [t]he availability of

32

alternative means to address the problem that gave rise to the motion or application for a continuance; [¶] (5) [t]he prejudice that parties or witnesses will suffer as a result of the continuance; [¶] . . . [¶] (7) [t]he court's calendar and the impact of granting a continuance on other pending trials; (8) [w]hether trial counsel is engaged in another trial; [¶] . . . [¶] (10) [w]hether the interests of justice are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance; and [¶] (11) [a]ny other fact or circumstance relevant to the fair determination of the motion or application." (Rule 3.1332(d).)  Here, as in *Oliveros*, the record does not indicate that in ruling on T.B.'s motions to dismiss, the trial court considered all of the relevant facts and circumstances, including those just listed in rule 3.1332.

As of February 27, 2023, it should have been apparent to the court that the Public Guardian's attorney had a heavily congested calendar.  The court had granted prior requests for continuances due to counsel's calendar conflicts.  And on February 27, counsel was scheduled for a total of 12 trials before the court.  In finding good cause to continue trial and deny T.B.'s motion to dismiss that day, the court accepted counsel's recital of conflicting obligations, without inquiring whether any other attorney in her office was available to bring the case to trial in a timely manner.  To that end, the court did not consider whether there were "alternative means to address the problem that gave rise to" counsel's request for a continuance. (Rule 3.1332(d)(4.)  The court also did not take into account that by February 27, it had already granted three continuances, and that 115 days had elapsed since T.B.'s initial demand for trial.  (Rule 3.1332(d)(2), (3).)  Further, the record does not indicate that the court considered any possible prejudice of further delay to T.B.  (Rule 3.1332(d)(5).)

33

Similarly, on March 27, the court found good cause to continue trial based on the unavailability of a courtroom, again without giving any consideration to any of the relevant facts described above. For example, it did not consider that by that time, it had granted four continuances and that 143 days had elapsed since T.B. demanded a trial. (Rule 3.1332(d)(2), (3).) Also, by this date, it should have been clear that the lack of sufficient courtrooms was a recurring obstacle to commencing trial in this case. But there is no indication that the court had looked into "[t]he availability of alternative means to address [this] problem." (Rule 3.1332(d)(4).)

Thus, the record does not show that the court considered all of the relevant facts and circumstances specified in rule 3.1332 when it granted the fourth and fifth trial continuances and denied T.B.'s motions to dismiss. Furthermore, there is no suggestion that at the time of the denials, or any time prior, the court in general viewed T.B.'s trial date with the level of urgency it requires. (See *James M.*, *supra*, 30 Cal.App.4th at p. 299.) Rather, it appears that the court focused exclusively on the calendar of the Public Guardian's attorney, as well as its own calendar. As such, the trial court's decision to deny T.B.'s motions to dismiss was missing the balance referred to in *Oliveros*. We thus conclude that the court's failure to carefully balance the relevant facts and competing interests at stake in this case constituted an abuse of discretion.[8]

We come to the question of prejudice. T.B. asserts that she need not show prejudice, but that in any event "the prejudice is self-evident." We

---

[8] Given our conclusion, we need not reach T.B.'s additional arguments—based on cases involving a criminal defendant's statutory speedy trial right—that the court abused its discretion by continuing trial because the delay was attributable to the failure and neglect of the state to devote adequate resources to the superior court and to County Counsel's Office.

disagree with both contentions.

To the extent T.B. argues she is not required to show prejudice because "nothing in the law" so requires, she is mistaken. That T.B. must demonstrate prejudice to obtain reversal under these circumstances is consistent with the California Constitution. As the Supreme Court explained, "article VI, section 13 [of the California Constitution] [generally] 'prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; accord, *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) "The section applies to both constitutional and nonconstitutional errors." (*F.P. v. Monier*, at p. 1108.) "It 'empower[s]' appellate courts 'to examine "the entire cause, including the evidence," ' and 'require[s]' them 'to affirm the judgment, notwithstanding error, if error has not resulted "in a miscarriage of justice." ' " (*Ibid.*) Thus, even if we have concluded above that the court abused its discretion in denying T.B.'s motions to dismiss, we cannot reverse unless she shows prejudice. (See, e.g., *People v. Justice* (1963) 211 Cal.App.2d 660, 665 ["in the absence of an abuse of discretion *and a showing of prejudice*, a denial of the continuance cannot serve as the basis for the reversal of a judgment of conviction"], italics added; *People v. Samayoa* (1997) 15 Cal.4th 795, 840 [same].) T.B. cannot do so.

T.B. argues, in conclusory fashion, that the duration of her temporary conservatorship "is inherently prejudicial," "[g]iven the clear legislative intent that LPS cases be handled and litigated expeditiously." T.B.'s reliance on "legislative intent" is misplaced, as she overlooks that the Legislature authorizes for a temporary conservatorship to last as long as six months in cases where, as here, the proposed conservatee requests a trial on the issue of grave disability. (§ 5352.1, subd. (c); *K.G. v. Meredith* (2012) 204 Cal.App.4th

35

164, 169.) T.B. further complains that she was prejudiced because the appointment could have been decided (and ended) earlier. However, a similar argument was rejected in *M.M.* (*M.M.*, *supra*, 39 Cal.App.5th at p. 501.) There, the court found the conservator failed to show prejudice where his "only complaint is the conservatorship would have ended . . . earlier if his trial had started [earlier]," but acknowledged that he received a fair trial and did not assert error in the jury finding that he was gravely disabled or in the court appointing a conservator. (*Ibid.*) Likewise here. T.B. does not assert she was denied a fair trial or any error in the court's determination that she was gravely disabled.

In sum, because T.B. has failed to establish prejudice from the denial of the motions to dismiss pursuant to section 5350(d)(2), her contentions do not require reversal.

**Due Process**

In the main heading of the legal argument section of her opening brief, T.B. asserts that "The Trial Court Abused Its Discretion and Violated [Her] Due Process Rights by Failing to Grant [Her] Motion to Dismiss the Petition." But T.B. makes no attempt in her opening brief to develop her due process claim, raising only several conclusory sentences on the issue. In her reply brief, T.B. makes a more detailed argument, applying for the first time the four-factor test in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) used to determine whether pretrial delay violates a criminal defendant's constitutional due process right to a timely trial. Although T.B.'s reply brief contains some attempt to develop her due process claim, it is "too late." (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80, fn. 7; see *Aviel v. Ng* (2008) 161 Cal.App.4th 809, 821 ["[Appellants] attempt, in their reply brief, to develop the argument, but it is too late. We disregard issues not properly

36

addressed in the appellant's opening brief"].) "[T]oo late because [respondent] did not have the opportunity to respond." (*Provost v. Regents of University of California*, *supra*, 201 Cal.App.4th at p. 1305.)

T.B. attempts to justify her belated arguments by relying on *Camacho v. Superior Court* (2023) 15 Cal.5th 354 (*Camacho*), a Supreme Court case that was decided after T.B. filed her opening brief. *Camacho* considered for the first time "the constitutional framework for evaluating the timeliness" of trials under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.). (*Camacho*, at p. 368.) The court noted that "the Courts of Appeal have uniformly borrowed the *Barker* framework used to adjudicate claims of speedy trial violations in criminal cases [citations]," while "several courts, including the Court of Appeal in [that] case, have also applied the *Mathews* [*v. Eldrige* (1976) 424 U.S. 319 (*Mathews*)] general balancing test . . . ." (*Camacho*, at p. 379.) The court then "clarif[ied] that this general balancing under *Mathews* is unnecessary; it suffices to consider the factors laid out in *Barker* in deciding whether an alleged [sexually violent predator] has been deprived of the constitutional right to a timely trial." (*Camacho*, at p. 379.) In a footnote, T.B. states that she "could not have addressed the *Camacho* analysis in her opening brief" and "although [she] made a due process claim in the opening brief, it was not developed extensively using the *Barker* . . . analysis given the preexisting rejecting these claims by applying the *Mathews* . . . analysis and rejecting these claims." We are not persuaded.

Although *Camacho* had not been decided before T.B. filed her opening brief, we fail to see why that prevented her from presenting any cogent argument to support her due process claim at the outset. T.B. acknowledges that the due process analysis of *Mathews* "preexist[ed]" *Camacho*. Also, as mentioned, *Camacho* noted that "the Courts of Appeal have uniformly

37

borrowed the *Barker* framework used to adjudicate claims of speedy trial violations in criminal cases." (*Camacho*, *supra*, 15 Cal.5th at p. 379.) Thus, the *Mathews* and *Barker* analyses were established frameworks for evaluating due process claims that T.B. could have raised even before the *Camacho* decision. Yet, she failed to address either one in her opening brief.

In any event, T.B. fails to explain how the *Barker* framework applicable to claims of speedy trial violations in criminal cases, or *Camacho*'s adoption of that framework to delayed trials under the Sexually Violent Predator Act, should carry over to this particular context. That is, she fails to establish that the *Barker* factors are appropriate for use in evaluating due process claims based on delays in holding conservatorship trials under the LPS Act. In fact, our Supreme Court has said that "[c]onservatorship proceedings are civil in nature, so the constitutional protections afforded criminal defendants do not directly apply." (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1092; see *Ben C., supra,* 40 Cal.4th at p. 538 [the Supreme Court "has recognized . . . that the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and that not all of the safeguards required in the former are appropriate to the latter"]; see also *Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 164 ["The cases from the Courts of Appeal are numerous, and find that conservatorship proceedings are not criminal proceedings, and that the procedural rules used in civil trials apply"].) For these reasons, and to prevent unfairness towards the Public Guardian who did not have an opportunity to respond to T.B.'s reply brief arguments, we are inclined to disregard such arguments.

Even if we were to consider them, T.B. fails to establish a due process violation based on her application of the *Barker* factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right,

and (4) the prejudice to defendant.  (*Barker*, *supra*, 407 U.S. at p. 530.)

In *Camacho*, the court found that in light of the seven-year delay of the trial, which had yet to occur in that case, the first *Barker* factor weighed in support of finding a due process violation.  (*Camacho*, *supra*, 15 Cal.5th at pp. 383, 390.)  It concluded that the second and third factors did not, given that the defendant was primarily responsible for the delays and did not demand trial at any point in the decade preceding that demand.  (See *id.* at pp. 384–391.)  As to the fourth factor, the court noted that prejudice may be analyzed in light of three interests implicated in the criminal context: " 'oppressive pretrial incarceration,' " " 'anxiety and concern of the accused,' " and, the most serious of these, " 'the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence. (*Id.* at pp. 391–392.)  Applying those principles, the court in *Camacho* determined that the delay in that case "had no appreciable impact on Camacho's ability to present his defense."  (*Id.* at p. 393.)  The court noted that there was "some amount of prejudice in Camacho's case" given the seven-year delay was "significant" and he had been involuntarily committed throughout that period, but there was "no indication that the delay has undermined the fairness of the proceedings."  (*Ibid.*)  "Any prejudice [was], moreover, extenuated by the fact that Camacho has not shown he in fact wanted a timely trial."  (*Ibid.*)  Balancing all of the *Barker* factors, the court concluded that Camacho failed to demonstrate a violation of his due process right to a timely trial.  (*Ibid.*)

We reach the same conclusion here.  We will assume without deciding, as T.B. asserts, that the first *Barker* factor weighs in favor of a due process violation.  Regarding the second, it appears that T.B.'s counsel bears some responsibility for the delay due to acquiescence to the first, second, and third

39

continuances. However, the requests were made by the Public Guardian, and largely granted because of the unavailability of its counsel and/or courtrooms. Thus, the second factor weighs slightly in favor of a due process violation. As for the third factor, assertion of the speedy trial right, this weighs against a due process violation for the reasons just mentioned—T.B. did not raise any objections to the delay in trial until February 27, 2023, after the court had granted three prior continuances, and after 115 days since her initial demand for a trial had elapsed. Turning to the fourth factor of prejudice, this factor also weighs against a due process violation. As in *Camacho*, T.B. fails to show that the "delay had [an] appreciable impact on [her] ability to present h[er] defense." (*Camacho*, *supra*, 15 Cal.5th at p. 393.) As discussed, T.B. does not argue that the delay undermined the fairness of her trial. Balancing these factors, we conclude T.B. fails to demonstrate a due process violation.

## DISPOSITION

The conservatorship order is affirmed.

40

_____
Richman, Acting P. J.

We concur:


_____
Miller, J.


_____
Mayfield, J. *


*In re T.B.* (A167919)

     *Superior Court of Mendocino County, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court; |
| Trial Judge: | Honorable Kirk J. Athanasiou; |
| Attorney for Petitioner and Respondent, Public Guardian of Contra Costa County: | Thomas L. Geiger, County Counsel, Nina Florence Dong, Deputy County Counsel; |
| Attorney for Objector and Appellant, T.B.: | Rudy Kraft under appointment by the Court of Appeal. |